Dye, J.
In this criminal appeal by leave, we consider the availability of recantation as a defense to a prosecution for perjury.
The defendant-appellant stands convicted of the crime of perjury in the first degree, under an indictment charging that, on March 28, 1955, while appearing as a witness before the additional Grand Jury of the County of Kings for the May, 1954 term of that court duly extended, he willfully and falsely testified concerning a certain conversation which had taken place on or about March 24 between him, another police officer named Chester Mann, and one Fred Jones, a convicted narcotic user. At the time, the Grand Jury was conducting an investigation to ascertain whether this appellant and said Mann — both of whom were detectives in the New York City Police Department, paired as a team and assigned to duty in the Narcotic Squad — had conspired with the said Jones to permit him to sell narcotics for the proceeds of such sales. It appears that on or about January 24, 1955, the appellant and his partner Mann arrested Jones for the possession of narcotics. A short time later and on or about February 10, 1955, Jones was released on bail because appellant had represented to the authorities that “ He was a good man to use as an informer.” Between the time of his release on bail and the Grand Jury investigation, Jones was met by the appellant and his team partner on a number of occasions, allegedly in the course of their legitimate police duties, for the purpose of obtaining information with regard to narcotic peddlers and users. Jones, however, thought otherwise. He complained to a representative of the Legal Aid Society that, in return for police protection, the officers were demanding that he turn over to them his profits in the sale of narcotics. He was referred to the office of the District Attorney, *442 Rackets Division. There he was outfitted with a recording device concealed on his person and sent out for a further interview with the defendant and his partner. As was expected, the trio met and, while sitting in an automobile parked in the vicinity of Howard Avenue and Hancock Street, Kings County, on or about March 24, had a long conversation, all of which was successfully picked up on the concealed recording device. When defendant appeared before the Grand Jury on March 28, 1955, he readily admitted that the conversation had taken place at the time and place mentioned. However, when asked a series of questions concerning details of the conversation material to the matter under investigation, many of which questions were framed in substantially the same wording as used in the recorded conversation, the defendant deliberately gave answers which he knew to be false. As if this were not enough, he went on to fabricate a conversation that had never occurred. He persisted in this course of conduct, even when given an opportunity to change it just before leaving the stand:*
After leaving the Grand Jury room, the defendant met his partner Mann who had also been a witness, and inquired concerning the nature of his examination. He was soon convinced that the District Attorney must have known all along the true contents of the conversation and that he had not been deceived by the false testimony. The implication of what he had done dawned upon him. The next day, in company with Mann, he sought advice- from their superiors in the Police Department, stating to them that they “ had not at the time told the Grand Jury all of the facts ” about which they were questioned, in the belief that certain operations of the Narcotic Squad were confidential matters and should not be disclosed. Their superiors did not support them in this view and they then took their story to the District Attorney and sought permission to reappear before the Grand Jury, which was granted.
*443 At the session held March 30, this defendant was questioned concerning his prior testimony and he freely admitted that it was false and that he knew he was lying, which conduct he sought to extenuate by saying: “ I was upset coming here and I didn’t know whether I was authorized to reveal to the Grand Jury or any person whether I had the authority to state the methods that we have to use in coping with'these people without the consent of my superior officer — how we work with them and why we have to lie and everything else. I just didn’t know whether we could answer these things.”
In the light of these circumstances, the appellant would have us reverse the judgment of conviction and dismiss the indictment as a matter of law, on the theory that the prosecution had been conducted in disregard of the doctrine of recantation as a defense, which is to say that in a prosecution for perjury, even if it be assumed that the answers are intentionally false and misleading, the defect is cured when the witness changes his statement and purports to tell the truth (People v. Gillette, 126 App. Div. 665; cf. King v. Jones, 1 Peake’s Reports 51, 53 [1791], citing King v. Carr, 1 Sid. 418 [1669]). However useful that rule may be as an aid in arriving at testimonial truth, it does not follow that it should be made a rule of universal application, for to do so might just as surely encourage perjury, especially in those situations where a witness does not recant until he becomes convinced that his perjury no longer deceives. It is fundamental that a witness may not disregard his oath to tell the truth in the first instance. Accordingly, we hold that recantation as a defense is primarily designed to correct knowingly false testimony only if and when it is done promptly before the body conducting the inquiry has been deceived or misled to the harm and prejudice of its investigation, and when no reasonable likelihood exists that the witness has learned that his perjury is known or may become known to the authorities. Thus, as a practical matter, the use of recantation as a defense should always depend on the circumstances of the given case (Llanos-Senarillos v. United States, 177 F. 2d 164; United States v. Norris, 300 U. S. 564; Penal Law, § 1620).
In this appeal the appellant’s testimony in the first instance was confessedly, knowingly, intentionally and deliberately false, and was calculated to deceive and mislead the Grand Jury in its effort to get at the truth of an alleged conspiracy to protect *444 narcotic peddlers and users in return for a share of the proceeds. The witness was no novice on the stand. He was a seasoned public officer, fully cognizant of the obligation of his oath, and backed by a wide experience as a witness in the courtroom and before other Grand Juries. He knew full well that the Grand Jury was entitled to the full truth. He persisted in his false testimony even when given an opportunity to correct it before leaving the stand. Unlike the Gillette case (126 App. Div. 665, supra), the correction came several days later and this only because he became convinced that the People had incontrovertible proof of his perjury. It was not a demonstration of penitence to purge the torments of a guilty conscience, hut a calculated effort to escape the dire consequences of admitted false swearing. By that time the damage was beyond repair — the Grand Jury was effectively thwarted from finding out the true relations between this witness and others engaged in an alleged narcotics conspiracy. The investigation had been frustrated by the willful act of a false witness- — -his recantation came too late.
The judgment appealed from should be affirmed.

 Q. “ Detective, you know you are under oath, uow, don’t you? A. I do. Q. You know what perjury means, don’t you? A. Yes, I do. Q. Do you want to change any of the testimony that you have given today? A. No. Q. You are certain you don’t want to change it? A. Yes, I am certain. Q. You still say that in this conversation with Fred Jones in this automobile in which you and Chester Mann were seated this Thursday, March 24th, no mention of $100 was made? A. No, definitely not. Q. Was any mention of $100 made by,anybody? A. Nobody at all. There was absolutely no mention of money made at all.”