UNITED STATES of America,
Plaintiff-Appellee,

v.

William DEL TORO and William Kaufman, Defendants-Appellants.

Nos. 395, 396, Dockets 74–2021, 74–2035.

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1974.

Decided Feb. 27, 1975.

**658**

Jacob W. Friedman, New York City (Marc Hermelin, New York City, on the brief), for defendant-appellant Del Toro.

Harold Baer, Jr., New York City (Guggenheimer & Untermyer, James V. Morgan, and Bruce J. Berman, New York City, of counsel), for defendant-appellant Kaufman.

Edward J. Kuriansky, Asst. U. S. Atty., S. D. N. Y. (Paul J. Curran, U. S. Atty., and John P. Flannery, II, Lawrence S. Feld, and John D. Gordan III, Asst. U. S. Attys., S. D. N. Y., of counsel), for appellee United States.

Before FRIENDLY, FEINBERG and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Appellants William Del Toro and William Kaufman were convicted of conspiracy, bribery and perjury after a two week trial before Judge Knapp and a jury. They challenge their conviction on several grounds in this appeal. We affirm in part and reverse in part.

The indictment charged appellants and a third defendant, Ralph Ruocco,[1] with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and with bribing a public official, in violation of 18 U.S.C. §§ 201(b) and 2. In addition, each individual defendant was charged with several counts of perjury, in violation of 18 U.S.C. § 1623.

The jury found Kaufman guilty of conspiracy, bribery and on three counts of perjury. Three other counts had been dismissed by the court before trial on the ground that Kaufman had effectively recanted his false testimony within the terms of 18 U.S.C. § 1623(d) during his testimony before the Grand Jury. He was sentenced to concurrent terms of four years on each count.

The jury found Del Toro guilty of conspiracy, bribery and on five counts of perjury. He was acquitted on a sixth count of perjury; a seventh had been dismissed at the close of all the evidence. He was sentenced by Judge Knapp to concurrent terms of a year and one day on each count.

Evidence introduced by the Government allowed the jury to find that Del Toro and Kaufman had conspired to bribe Pedro Morales, Assistant Administrator of the Harlem-East Harlem Model Cities Program. Kaufman, a lawyer and a real estate broker, hoped that Morales would use his official position to secure for Kaufman a lease by Model Cities of significant office space in one of the buildings for which Kaufman was the renting agent. The benefit to Kaufman would be a lucrative commission. Del Toro, the Executive Director of an East Harlem anti-poverty agency, Massive Economic Neighborhood Development, Inc. (MEND), acted as a middle man in the transaction.

The first meeting between Kaufman and Morales occurred during late August, 1972, as a result of a chance con-

1. Ruocco pleaded guilty to the conspiracy count and testified for the government.

versation between Del Toro and Morales in Morales' office. Morales mentioned to Del Toro that he had been charged with the duty of finding office space for a new branch of Model Cities. Del Toro stated that space was available in the Ludwig-Baumann building, where MEND offices had previously been located, and that he knew Kaufman, the rental agent. Several days later, Del Toro telephoned Morales to say that Kaufman was at the MEND offices. Morales joined Del Toro at MEND offices, met Kaufman, and discussed the possibilities of leasing office space with both men. At one point, Morales told Kaufman that to secure the lease, Kaufman would have to pay a 10 per cent commission as a bribe. Kaufman indicated that he knew he might have to pay a bribe and would think it over.

On September 1 Morales was arrested by the United States Attorney's Office on charges of conspiracy and receipt of bribes relating to a different matter, a Model Cities summer camp program. Morales admitted his complicity and agreed to assist in a joint federal-city undercover investigation into official corruption in the Model Cities Administration. Thereafter, Morales, while retaining his job with Model Cities, aided investigators by tape recording conversations with various individuals who continued to perceive him as a corrupt administrator. Among those individuals were Kaufman and Del Toro.

On September 20 Kaufman dropped in at Morales' office at a time when, by chance, Morales happened to be wearing concealed recording equipment in connection with another investigation. Morales recorded his conversation with Kaufman, in which the two discussed the possibility of the renting of space in the Ludwig-Baumann Building by Model Cities. Kaufman assured Morales that a mutually lucrative deal could be worked out in detail. When Morales stated that his superior would want money "up front," Kaufman stated that he usually operated on trust with people, but he did not refuse out of hand to supply front money. Kaufman also noted that they would have to build up a business record of their transaction to conceal the payoff.

On October 26 Morales recorded a conversation with Del Toro in which Del Toro offered to help Morales come to an agreement with Kaufman, who had not gotten in touch with Morales since their September 20 meeting.

On October 30 Morales met with Kaufman at Del Toro's office, as Del Toro had arranged, and the conversation was recorded. Del Toro was not present. Kaufman told Morales that the owners of the building had agreed to pay Morales $15,000 if he could arrange for Model Cities to rent the space and that the payoff would be disguised as a part of Kaufman's commission agreement. Kaufman would make his payment to Morales once the commission had been paid to Kaufman. In response to Morales' expressed fears of a double-cross, Kaufman stated that he would not jeopardize his continuing good relationship with the City personnel by deceiving Morales.

Thereafter, Morales had a series of meetings both with Del Toro and Kaufman which were recorded. In such meetings, Del Toro demonstrated specific knowledge of the transactions between Kaufman and Morales and urged Morales to trust Kaufman. He also agreed to help Morales secure front money from Kaufman. In meetings with Kaufman, Kaufman assured Morales that money would be forthcoming once serious negotiations on the lease had begun.

In the meantime, Kaufman had informed Ralph Ruocco, assistant to the President of Acme-Hamilton, the New Jersey corporation which owned the Ludwig-Baumann Building, that it might be necessary to bribe Model Cities officials in order to secure the lease. On November 14 Kaufman and Ruocco, on behalf of Acme-Hamilton, signed a commission agreement which included inflated percentage payments to Kaufman, out of which he would make payments to the officials. In January, Kaufman succeeded in getting a check for $500 from Ru-

occo, who had purportedly gotten approval from his superior, the President of Acme-Hamilton. On January 26 at a prearranged meeting, Kaufman paid the $500 in cash to Morales and urged him to press forward with arrangements for the lease. Kaufman later told Ruocco that the money had been paid to Morales.

### The perjury counts against Kaufman

On February 2, 1973, Kaufman appeared before the Grand Jury, where he was advised of his constitutional rights and of the fact that he was a target of their investigation. After having denied complicity in any corrupt activities, Kaufman was shown boxes of tape recordings. He then admitted that Morales had asked him for money, but denied offering or paying any bribes.

Thereafter, Kaufman met with the Assistant United States Attorney conducting the grand jury investigation, who reminded him of his constitutional rights and then read to him the perjury statute, drawing his attention to the recantation provision and to the proviso that a recantation can no longer be made once the perjury has become manifest. The Assistant then told Kaufman about the tapes of his conversations with Morales, after which Kaufman admitted offering a bribe to Morales. He continued to deny that he actually paid the $500.

The Assistant and Kaufman then entered into an exchange in which Kaufman indicated that he would be willing to tape conversations with officials of Acme-Hamilton in return for a deal with the Government. Denied his request for full immunity, and informed that he would have to plead guilty to a felony, Kaufman decided to consult an attorney.

On February 6 Kaufman and his lawyer met with the Assistant and, after some discussion, Kaufman agreed to cooperate with the Government and to plead guilty either to conspiracy or to perjury. He now admitted paying the $500 to Morales and revealed his discussions and arrangements with Ruocco. During the subsequent, brief period of cooperation, Kaufman himself tape recorded two conversations with Ruocco, in which Ruocco indicated his knowledge of the bribery transactions and implicated his superiors at Acme-Hamilton. Kaufman was twice called to appear before the Grand Jury thereafter to adjourn his subpoena, but he did not testify.

On February 16 Kaufman again asked for full immunity or for a chance to plead to a gratuity count in return for his continued cooperation. Informed that this arrangement would be impossible, Kaufman withdrew from his agreement to cooperate with the Government. He appeared once more before the Grand Jury, but failed to testify further on advice of counsel. Kaufman also warned Ruocco by telephone that they were under investigation, and suggested that they meet to work out a coherent story.

### Del Toro perjury

In the meantime, Del Toro had appeared before the Grand Jury on February 16, where, after being informed of his rights and of the fact that he was a target of the investigation, he denied knowing of any offer or payment to Morales and participating in any way in the transaction. He admitted only that he thought Model Cities would be paying Kaufman a brokerage fee and that he was aware that payoffs were not uncommon among public officials. In a second appearance before the Grand Jury on February 23, Del Toro declined to change his earlier testimony. He did admit that he had introduced Kaufman and Morales and had been present at their first meeting, but claimed he had been in a different part of the room when they talked.

### I

Both appellants contend that their convictions on the substantive counts, two and three, for violation of 18 U.S.C. § 201(b)(2) cannot stand, and that their conviction on the conspiracy count, count 1, must also be reversed. We agree with their contention on the substantive

counts. We disagree with respect to the conspiracy count.

18 U.S.C. § 201(b)(1) provides that whoever gives or promises anything of value to any "public official" with intent to influence any official act is subject to fine and imprisonment. Kaufman and Del Toro were convicted under § 201(b).[2]

"Public official" is defined in Section 201(a), in pertinent part, as an "officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government."

"Official act" is there defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in his official capacity, or in his place of trust or profit."

Appellants raise the point that Morales, who was a city employee, was not a "public official" nor capable of performing an "official act" within the meaning of the statute.

The trial judge had some reasoned hesitation on the point but concluded that "a close legal question ought to be decided in favor of the Government so it can be reviewed." He accordingly denied the defense motions to dismiss, and charged the jury as follows. After telling the jury that in order to convict they must find that Kaufman promised Morales $15,000 and that "the purpose of the promise was to influence him, Morales, in an official act, namely, to induce him to make a favorable recommendation that would induce Model Cities to lease the Ludwig-Baumann Building," he proceeded to explain the third element of the offense "that Morales was a public official."

On this, the trial judge charged as follows:

"Official, of course, means an official of the United States. We have no jurisdiction in this Court over the bribery of any other officials. That in turn has been defined by statute as one who is acting for or on behalf of the United States or any agency thereof.

"Now, you have heard the testimony of Mr. Torres to the general effect that the United States government had determined to implement certain of its social and government objectives by financing certain state or city agencies, one of which was Model Cities, of which Mr. Morales was a deputy director. You will recollect what Mr. Torres said about the extent to which the United States through HUD, Housing and Urban Development, supervised Model Cities' activities and that the United States paid 100% of the cost of Model Cities' program and 80% of its salaries including, of course, Mr. Morales'.

"The salaries were actually paid by the city but through monies advanced by the government, according to Mr. Torres' testimony. On the basis of such testimony you may conclude that Mr. Morales was: 'Acting for or on behalf of the United States or an agency thereof,' and that he was a public official within the meaning of the statute."

The jury was permitted to convict on the substantive counts on the theory that, although Morales was a city em-

---

**2.** Section 201(c)(1) correlatively subjects to fine and imprisonment the "public official" who corruptly receives or agrees to receive anything of value in return for being influenced in his performance of any official act.

It is also a crime under 18 U.S.C. § 201(b)(2) for the briber to make the gift or promise to the public official to influence him to commit or aid in committing or collude in or allow, any fraud, or make opportunity for the commission of any fraud on the United States. There is a correlative provision in 201(c)(2). The case was tried on the theory only of "official act" under subsection (b)(1) and the court charged only "official act." In any event, under either subsection it would be necessary to find that the person bribed was a "public official."

ployee, he could be found to be a federal "public official" because the federal government financed certain city agencies like Model Cities by paying 100% of the cost of its program and 80% of its salaries through a grant to the City, and because HUD supervised Model Cities' activities to some extent.

In view of the enormous amount of funding by the Federal Government on a broad spectrum which includes welfare, housing and health, we are constrained to take a close look at the determination below and the effect of bringing clearly illegal conduct under state law within the ambit of the federal jurisdiction.

■ It seems to us that a healthy regard for the federal system of divided powers, as well as for the still accepted doctrine that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), compels a close scrutiny. In discerning Congressional intent we may consider whether an expansive interpretation of the statute "would alter sensitive federal-state relationships [and] could overextend limited federal police resources." Rewis, supra, 401 U.S. at 812, 91 S.Ct. at 1059.

Turning to the question of ambiguity, we write on a comparatively clean slate, for there are no decisions holding city employees like Morales to be federal "public officials." Cases cited to this point by the Government are inapposite.

In United States v. Levine, 129 F.2d 745 (2 Cir. 1942) the Market Administrator was appointed directly by the Secretary of Agriculture, and in turn appointed the defendant who was bribed to use his influence to stave off investigations under the federal statute. In Harlow v. United States, 301 F.2d 361, 370 (5 Cir. 1962) the post exchanges were themselves direct instrumentalities of the United States and its employees were "acting for the United States."

Cases cited under the federal fraud statutes are different because they in-volved obtaining *federal* funds by fraudulent means, see United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443; United States v. Candella, 487 F.2d 1223 (2 Cir. 1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974), a direct injury to the federal government.

Our first inquiry then is whether Section 201 on its face takes in a person in the status of Morales as a federal "public official." The Government relies on the phrase "acting for or on behalf of the United States in any official function." It places no emphasis on the modifying phrase "under or by authority of any such department, agency or branch of Government."

■ We do not believe that Morales was acting "under or by authority of any such department, agency or branch" of the federal government. He was a city employee, carrying out a task delegated to him by his superior, another city employee. If his superior had accepted Morales' recommendation, the decision to move Model Cities' offices to the Ludwig-Baumann Building would still have had to be passed on by the City Department of Real Estate, the Corporation Counsel, and the Board of Estimate. Only after all these agencies had approved would the request for funding have been made by the City to HUD. There were no existing committed federal funds for the purpose.

We would have to strain to find a Congressional intention to include Morales as a federal "public official" in these circumstances.

We think, moreover, that Congress, by a process of exclusion, has shown a contrary intention with respect to persons like Morales. A broader look at the bribery and related statutes shows this.

18 U.S.C. § 203 includes within the prohibitions against bribery "a special Government employee"—essentially, as defined in Section 202, a short-term employee.

When the Public Health Service Statute was enacted, it subjected to the pro-

visions of 18 U.S.C. § 203 "any State officer or employee who is assigned to the Department (HEW) without appointment." 42 U.S.C. § 246(f)(7)(A). Thus, even when there was an actual interchange of personnel with the states as provided in 42 U.S.C. § 246(f)(1) et seq., Congress thought it necessary to make the state employee subject to the bribery statutes by special reference—an unnecessary reference if he would be broadly read to be "acting for or on behalf of the United States" under 18 U.S.C. § 201 or § 203 in any case.

Indeed, in 1971, in formulating the Government Organization Statute, Congress specifically provided, 5 U.S.C. § 3374, for every "executive agency", in which HUD is included, that "(a) An employee of a state or local government who is *assigned* to an executive agency under an arrangement under this subchapter . . . (c) During the period of assignment, a State or local government employee *on detail* to an executive agency . . . (2) is deemed an employee of the agency for the purpose of . . . sections 203, 205, 207, 208, 209, 602, 603, 606, 607, 643, 654, 1905, and 1913 of title 18 . . .." (Emphasis added).[3]

If Section 201 is given the broad reading of the court below, there is no need for the earlier Public Health or later Government Organization statutes. Whether we consider the statutory treatment as an expression of contrary Congressional intent, however, or as simply a contribution to the ambiguity of Section 201, we hold that, in the circumstances of this case, Morales was not a federal "public official" and that it was reversible error to permit the jury to find that he was.

■■■■ We note in passing that we reject appellants' alternative theories that

even if Morales was a federal "public official" his mere recommendation would not be sufficient to constitute an "official act." See United States v. Carson, 464 F.2d 424, 433 (2 Cir. 1973); as well as their contention that because, at least with respect to Count 3, Morales was an undisclosed undercover agent, his status negated the concept of bribery. See United States v. Rosner, 485 F.2d 1213, 1228–29 (2 Cir. 1973), cert. denied, 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

## II

When we turn to the convictions on the conspiracy count we are not under the constraint of interpreting a particular substantive statute. The conspiracy charged here was within the federal criminal jurisdiction. The indictment alleged, *inter alia*, that the defendants conspired "to defraud the United States and its departments and agencies in connection with the performance of its lawful governmental functions by obstructing and hindering the United States Department of Housing and Urban Development in the impartial, fair and honest distribution of federal funds and by depriving the United States of the faithful and honest services of employees of the New York City Model Cities Administration which was, at all times relevant to this indictment, funded and supervised in substantial part by the United States Department of Housing and Urban Development."

■■■■ The essence of the conspiracy was the corrupt agreement to defraud the United States in the performance of its lawful governmental functions. On this charge there is no need to find Morales a federal public official. And Judge Knapp correctly explained that to the jury.[4] Here the conspiracy might

3. Significantly, in prohibiting political activity by state and local employees there is no requirement that the local employee be "assigned" to the federal agency. In the context of prohibition of political activity, as distinguished from bribery, the definition is broad. A " 'state or local officer or employee' means an individual employed by a State or local

agency whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a Federal agency . .." 5 U.S.C. § 1501.

4. The court charged that "in the conspiracy count all you must find in this regard is that

never achieve its objective, but that would not be a determining factor. An agreement that might defraud the federal government in its functions at some time in the future, followed by an overt act, makes out the conspiracy charged. It is not necessary that the agreement be to defraud the Government out of money, Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); United States v. Jacobs, 475 F.2d 270 (2 Cir.), cert. denied sub nom. Lavelle v. United States, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973), but only to impede its lawful functions.

■ While some of the conspiracy cases cited by the Government are easier than this case because federal money had actually been set aside, Harney v. United States, 306 F.2d 523, 531 (1 Cir. 1962) or applied for, United States v. Thompson, 366 F.2d 167 (6 Cir. 1966), we do not think the difference to be substantial. The conception that a criminal conspiracy has been formed is less restrictive than whether an "attempt" has gone far enough to make the act charged a criminal act.

### III

Kaufman contends that his conviction on the perjury counts (false declaration) under 18 U.S.C. § 1623 is legally deficient in two respects. He contends first that the prosecutor should never have taken him before the Grand Jury knowing that he was a potential defendant without revealing in advance that Morales had secretly taped conversations with him at the instance of the government. Kaufman contends, moreover, that the government failed to live up to its obligations by not informing the Grand Jury that he had recanted, before permitting the Grand Jury to indict him for making false declarations.

■ Kaufman cites no authority in support of the first proposition. His argument is that the prosecution is under

the object of the conspiracy was to some extent to subvert the Model Cities program, and hence the objectives of the United States, by depriving Model Cities, and hence the

a duty to inform a prospective defendant that there are recordings of his own criminal conduct, distinguishing cases where the testimony of other witnesses was not disclosed. United States v. Winter, 348 F.2d 204, 210 (2 Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). Judge Weinfeld's discussion in *Winter*, speaking for this court, lays the point to rest. There is no duty on the prosecution to tell a Grand Jury witness what evidence it has against him or to give him repetitive warnings that it is his duty to tell the truth when he has sworn upon his oath to tell the truth. It is not an unfair dilemma to put upon a prospective defendant to require him to claim privilege or to tell the truth. Though Kaufman was not in custody, he was given the *Miranda* warnings.

We do not condone the use of the Grand Jury for the sole purpose of preparing an already pending indictment for trial, see United States v. Dardi, 330 F.2d 316, 336 (2 Cir. 1964), and there may be situations in which no indictment has yet been filed where this stricture would apply. In this case, however, there was a continuing investigation into possible corrupt practices of Model Cities personnel and some who dealt with them. Kaufman could have been a valuable witness for the Government, see United States v. Sweig, 441 F.2d 114, 121 (2 Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971), as indeed he tried to be in his period of cooperation after his perjury.

The second contention concerning his alleged recantation is also without merit.

In 1970, Congress in enacting the Organized Crime Control Act included a section relating to false declarations before a grand jury or court, Pub.L. 91–452, Title IV § 401(a), 84 Stat. 932. That section, 18 U.S.C. § 1623, addressed itself to the problems of recantation. Congress provided:

′ United States, of Mr. Morales' unprejudiced judgment regardless of whether he technically fitted the definition of public official as I have defined that term to you."

"Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed." 18 U.S.C. § 1623(d).[5]

■ The purpose was obviously to induce the witness to give truthful testimony by permitting him voluntarily to correct a false statement without incurring the risk of prosecution for doing so. 2 U.S.Code Cong. & Admin.News, p. 4024 (1970).[6]

Kaufman appeared before the Grand Jury on February 2, 1973. He was advised of his privilege against self-incrimination and that he was a target of the Grand Jury investigation. After he gave what the Assistant United States Attorney believed to be perjurious testimony, he was warned that he might be subject to a perjury prosecution, and

asked whether "in light of that warning" he wished to change his testimony. Kaufman said no. When the Assistant conspicuously put some boxes of tape recordings on the table, Kaufman said he would like to change his testimony and admitted that Morales had asked him for money. He continued to deny, however, that he had offered Morales $15,000, that he had paid Morales $500 and that he had discussed the matter with Del Toro. These denials, among others, were the basis for the false declaration counts on which Kaufman was convicted in Counts 12, 13 and 16.[7]

After this first Grand Jury session, Kaufman went to the office of the United States Attorney where he talked with several assistants, recanting some of the perjury that day, and the balance on February 6, 1973 after consulting counsel. Having agreed to become a cooperating witness for the Government and himself to wear a tape recorder in further pursuit of crime, he later balked at wearing a tape recorder in a proposed conversation with the president of the company which owned the Ludwig-Baumann building on the obviously silly excuse that the latter was an honest per-

5. The Supreme Court in United States v. Norris, 300 U.S. 564, 57 S.Ct. 535, 81 L.Ed. 808 (1937), had held that "the telling of a deliberate lie by a witness completes the crime defined by the law." (§ 125 of the U.S.Criminal Code; R.S. 5392; 18 U.S.C. § 231), and that a prompt recantation does not excuse the perjury though it may demonstrate that there was no wilful intent to swear falsely. 300 U.S. at 576, 57 S.Ct. at 540.

In People v. Ezaugi, 2 N.Y.2d 439, 161 N.Y. S.2d 75, 141 N.E.2d 580 (1957), the Court of Appeals put a severe limitation on the famous rule of People v. Gillette, 126 App.Div. 665, 111 N.Y.S. 133 (1908), holding that the *Gillette* rule applied only "when no reasonable likelihood exists that the witness has learned that his perjury is known or may become known to the authorities." 2 N.Y.2d at 443, 161 N.Y.S.2d at 78, 141 N.E.2d at 583. This made the New York recantation rule stricter than *Gillette*, but more liberal than the federal rule of *Norris*. The rule of *Ezaugi* was codified in 1967 to provide that "in any prosecution for perjury, it is an affirmative defense that the defendant had retracted his false statement in the course of the proceeding in

which it was made . . . before it became manifest that its falsity was or would be exposed." N.Y.L.1965, c. 1030, Penal Law, McKinney's Consol.Laws, c. 40, § 210.25.

Section 1623(d) was adapted in modified form from the New York Penal Code, Section 210.25. See 2 U.S.Code Cong. & Admin. News, 1970, pp. 4023–24; Hearing and Reports of the Committee on the Judiciary, S. 30 (1969). The New York Statute codified the ruling in People v. Ezaugi, *supra*. In the New York statute the retraction is made an "affirmative defense."

6. Section 1621, the general perjury statute, has no recantation provision.

7. Counts 11, 14 and 15, based on Kaufman's initial denials of having any knowledge of corruption in Model Cities and of having been asked for or having discussed money with Morales, were dismissed prior to trial with the Government's consent, in view of Kaufman's recantation and admission during his Grand Jury appearance that he had in fact been asked for money by Morales.

son who knew nothing of Kaufman's illicit relation with Morales.[8]

■ Kaufman argues that the failure of the prosecutor to tell the Grand Jury that he had confessed to the substantive crime and conspiracy—for that is what his "recantation" meant—bars his prosecution for perjury.

Kaufman appeared before the Grand Jury three times after the purported recantation in the United States Attorney's office. On apparent advice of counsel he made no effort himself to recant before the Grand Jury. We need not decide whether Kaufman still had a chance to recant his perjury or whether his perjury had by then been made manifest, for he failed to use his own opportunity to recant before the Grand Jury in any event.

In fact, his "recantation," made in piecemeal fashion, was part of a plea bargaining process which could not have taken place before the Grand Jury, and which was hardly the type of recantation considered by Congress in enacting the section.

■ Kaufman makes the additional argument that the prosecutor unfairly cut off his recantation "right" by making his perjury "manifest" as soon as he left the Grand Jury for the first time. However, the prosecutor's placing of boxes of tape recordings on the table in the Grand Jury room should have indicated that the time for recantation had come, or at least, did not have long to run. Kaufman thereupon simply made one grudging admission, but he failed to recant his denial that he had bribed and agreed to bribe Morales. Moreover, as indicated, Kaufman later appeared before the Grand Jury again but made no effort to tell it the truth. Under the circumstances, the claim that his "right" to recantation was unfairly cut off is without merit.

■ There was no need to warn appellant of his "right" to recant, as we have recently held. United States v. Cuevas, 510 F.2d 848 (1975); United States v. Lardieri, 497 F.2d 317, 321 (3 Cir. 1974), on rehearing, remand withdrawn and judgment affirmed, 506 F.2d 319 (3 Cir. 1974).[9]

■ Nor was there any need, as appellant contends, for the prosecutor to notify the Grand Jury of his "cooperation." He quotes from the Commentary on the Standards Relating to the Prosecution Function (1971) that "a prosecutor should present to the grand jury evidence which would reasonably tend to negate the guilt of the accused. . ."

■ A guilty person who "cooperates" does not negate his guilt thereby. It is commonplace that punishment is for the court, not the jury, grand or petit.

## IV

■ Del Toro contends that the use of Kaufman's Grand Jury testimony violated the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), since Kaufman did not testify. Though appellant argues that "the recantation involving Del Toro" was read to the jury, no transcript reference is given, nor could any be found. In the Grand Jury testimony of Kaufman there is no inculpatory statement regarding Del Toro. Hence Bruton is not applicable. United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1058 (2 Cir. 1970); United States v. Deutsch, 451 F.2d 98, 116 (2 Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972); United States v. Tropiano, 418 F.2d 1069, 1080–81 (2 Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970).

---

8. The real basis for the breakdown of further cooperation was presumably the Government's refusal to grant Kaufman immunity in return for his cooperation.

9. In view of our conclusion there is no need to consider whether the point is waived by failure to move prior to trial. See United States v. Kahn, 472 F.2d 272 at 283 n. 9 (2 Cir. 1973).

We have examined the other claims of error and found them without merit.[10]

The conviction on counts 2 and 3 is reversed, as to both appellants. The conviction on the other counts is affirmed as to both appellants.[11]

10. Del Toro's claim of entrapment is frivolous. The initial meeting between Kaufman and Morales was arranged by Del Toro and he was told by Kaufman to carry the message to Morales that Kaufman would split $50,000 less taxes with Morales in exchange for the lease. All this occurred before September 1, 1972, the time when Morales was arrested and began to act as a government undercover agent.

11. We have noted Kaufman's argument that there is a serious disparity in sentences on convictions from Model Cities corruption, with Kaufman's sentence by far the most severe. We do not exercise appellate review on the sentencing judge's discretion, but we call the judge's attention, not only to the reversal of the substantive counts, but also to the disparity, for his consideration if a Rule 35 motion is made.