In the Matter of subpoenas served upon Bishop Milton L. WOOD et al.

No. 77 Cr. Misc. M–11–118.

United States District Court,
S. D. New York.

Feb. 4, 1977.

As Amended Feb. 17, 1977.

Elizabeth M. Fink, New York City (Daniel L. Meyers, Margaret L. Ratner, Susan V. Tipograph, New York City, of counsel), for respondents Maria Cueto and Raisa Nemikin.

Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., New York City (Thomas E. Engel, Asst. U.S. Atty., New York City, of counsel), for the United States of America.

Robert S. Potter, W. Peter Burns, Patterson, Belknap & Webb, New York City, for intervenor The Episcopal Diocese of New York.

PIERCE, District Judge.

## MEMORANDUM AND ORDER

In April 1975 a grand jury was empaneled in this district to commence an investigation into a series of terrorist bombings of banks, corporate offices, and other buildings located in the City of New York. According to the government, the responsibility for these bombings has been claimed by an organization known as Fuerzas Armadas de Liberacion Nacional Puertorriquena ("FALN"). The term of the April 1975 grand jury expired in October 1976, and on November 9, 1976, the present grand jury was empaneled to continue the investigation of these bombings. According to the subpoenas issued by that body, the grand jury is presently investigating possible violations of 18 U.S.C. § 371, which statute makes it a crime for any person to conspire to commit any offense against the United States.

On November 24, 1976, the grand jury issued a subpoena duces tecum to Bishop Milton L. Wood, Executive for Administration of the Episcopal Church, which subpoena commanded the production of certain documents and records of the Episcopal Church Center located in the City of New York. Among the items requested were all records in the custody of the Bishop relating to Maria Cueto, National Director, and Raisa Nemikin, Secretary, of the National Commission on Hispanic Affairs of the Episcopal Church ("the Hispanic Commission"). The Hispanic Commission is an agency of the Episcopal Church established in 1970 to develop programs to aid in solving the social, economic and spiritual needs of the Hispanic Community of the United States. According to the respondents, the Hispanic Commission has developed programs in the South Bronx and in Los Angeles, California; it has also funded certain programs in Wisconsin, Illinois, and New Mexico. There is some question as to whether the Hispanic Commission presently is in the process of being dissolved.

As set forth in the affidavit of the prosecutor in charge of the grand jury inquiry, the subpoena served upon Bishop Wood was issued following a series of meetings between the Bishop and agents of the Federal Bureau of Investigation ("FBI") during which meetings Bishop Wood stated that the Executive Council of the Episcopal Church desired to cooperate fully with the government in helping to locate one Carlos Torres, a member of the Hispanic Commission, believed by the government to be a member of the FALN and involved in certain of the bombings under investigation.

On November 3, 1976, local police officers and agents of the FBI in Chicago, Illinois, uncovered a "bomb factory" in a Chicago apartment, containing certain papers linking the occupants to the FALN. Fingerprints of certain persons, including Carlos Torres, were found in the premises, and the agents also uncovered a piece of paper indi-

cating that Torres was affiliated with the Hispanic Commission. This led the agents to the Hispanic Commission and the interviews with Bishop Wood which followed.

On November 18, 1976, agents of the FBI interviewed respondents Cueto and Nemikin at the offices of the Episcopal Center. In response to questioning, respondents stated that they had seen Torres on October 26, 1976, when he had visited their offices; they further stated that they did not know his whereabouts. Shortly thereafter, while on business of the Commission in Puerto Rico, Cueto and Nemikin were again questioned by FBI agents. Further, on November 22, 1976, the agents visited respondents at the Episcopal Center and questioned them about one Oscar Lopez, as well as concerning other individuals and former members of the Commission whose whereabouts were apparently unknown to the FBI. Respondents Cueto and Nemikin stated that they did know the persons involved, but they did not have, or declined to give, any further information about the individuals beyond acknowledging their present or former association with the Hispanic Commission. According to the affidavit of Maria Cueto, the agents then informed her that if she didn't cooperate with them, she would be called before the grand jury and "things would be very bad" for her. Raisa Nemikin states that an FBI agent told her that if the FBI found out she was withholding information, she might be charged with harboring a fugitive.

In the interim, Bishop Wood and certain of his employees had been complying with the requests of the government agents for information. The Bishop furnished to the FBI personnel records of the Hispanic Commission, as well as expense records of several persons affiliated with the Commission. According to the government, the November 24, 1976 subpoena served upon Bishop Wood was fully complied with and is not presently outstanding. Thus, by an order entered this day, this Court denied as moot a motion to quash that subpoena.

On January 4, 1977, the grand jury issued subpoenas ad testificandum which were served upon respondents Cueto and Nemikin. (Ex. G and H annexed to respondent's motion papers) Three days later, a subpoena was issued and served upon Bishop John M. Allin, Presiding Bishop of the Episcopal Church; however, that subpoena was withdrawn by the government on January 20, 1977, and it is not presently outstanding.

Ms. Cueto appeared pursuant to the testimonial subpoena on January 10, 1977, but refused to be sworn before the grand jury until after she had retained an attorney. Respondent Cueto was brought before Judge Lloyd MacMahon of this Court, sitting at that time in this Part, and again she refused to be sworn. Judge MacMahon held Ms. Cueto in summary contempt and ordered her incarcerated. Thereafter Ms. Cueto, through her counsel, entered into an agreement with the government pursuant to which she was released from confinement, but asked no questions before the grand jury. On February 1, 1977, respondent filed motions to quash, a motion to suppress the evidence produced by Bishop Wood, and a motion for an order directing the government to produce for their inspection all records of interviews conducted of them by government agents. In the days following, certain other persons filed motions to intervene and to quash.

This Court has made its rulings on the motions to intervene and on the motions to quash the Woods and Allin subpoenas, as well as on the respondent's motion to suppress. Thus, the remaining questions involve the Cueto and Nemikin testimonial subpoenas and the motions to produce FBI records.

### The Motions to Quash

The motions to quash made by respondents Cueto and Nemikin raise identical issues, and thus they will be addressed together. In support of their motions, respondents make three arguments. First, movants argue that the subpoenas were issued in violation of the Hispanic Commission's members' right to free association, protected by the first amendment of the Constitution of the United States. Second,

movants claim that the grand jury inquiry infringes upon their free exercise of religion, and that the subpoenas have and will create a "chilling effect" upon the unfettered exercise of the Hispanic Commission's activities. The intervenor Diocese joins in these two arguments. Movants' final argument is that the subpoenas have been issued not for valid grand jury purposes but to assist the FBI in its investigation; thus it is claimed that the actions of the government constitute an abuse of grand jury process.

Accordingly, this Court is called upon to resolve a controversy which the movants assert brings the powers of the grand jury into conflict with fundamental rights protected under the Constitution. Under such circumstances, courts have sought to perform the dual role of zealously protecting constitutional rights and of being alert to guard against abuses of the investigatory powers of the grand jury. In this balancing of claimed conflicting interests, the Court must also weigh the traditional powers of the grand jury to investigate into the possible commission of crime, and the right of the public to every man's evidence except where a valid privilege is appropriately invoked. See *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Hoffman v. United States*, 341 U.S. 479, 485, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972). Thus, the inquiry involves a delicate balancing of the various interests involved, with a continuing attention to the protection of fundamental liberties. As stated recently by Judge MacMahon of this Court,

> "Rights guaranteed by the Bill of Rights must be zealously guarded if they are not to be whittled away, little by little, through minor seemingly innocuous intrusions which may, over the course of time, result in significant erosion of those rights." (*In re Nwamu*, 421 F.Supp. 1361 (S.D.N.Y.1976))

The Supreme Court has often admonished the prosecutors and the courts to be

> " 'alert to repress' any abuses of the investigatory power invoked, bearing in

mind that while grand juries 'may proceed, either upon their own knowledge or upon the examination of witnesses, to inquire . . . whether a crime cognizable by the courts has been committed', yet 'the most valuable function of the grand jury [has been] not only to examine into the commission of crimes, but to stand between the prosecutor and the accused' ". (*Hoffman v. United States, supra*, 341 U.S. at 485, 71 S.Ct. at 817. (citations omitted))

There can be little doubt under the cases that the first amendment rights of free association and freedom of religion reach within the closed doors of the grand jury chamber. See *Branzburg v. Hayes, supra; Bursey v. United States, supra; In re Verplank*, 329 F.Supp. 433, 438 (C.D.Cal. 1971); see also *Application of United Electrical Workers*, 111 F.Supp. 858 (S.D.N.Y. 1953).

Accordingly, when first amendment rights are validly asserted on a motion to quash, the burden shifts to the government to demonstrate a "compelling interest" sufficient to outweigh the possibility of infringement. See *Branzburg v. Hayes, supra*, 408 U.S. at 690, 92 S.Ct. 2646; *Bursey v. United States, supra; Glass v. Heyd*, 457 F.2d 562, 564 (5th Cir. 1972).

As Judge Hufstedler of the Ninth Circuit has written,

> "When governmental activity collides with First Amendment rights, the Government has the burden of establishing that its interests are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests." (*Bursey v. United States, supra*, 466 F.2d at 1083)

In order to apply these principles to the circumstances here, the Court must first ask whether the constitutional rights asserted here are in fact in danger of infringement. The Court has examined the papers of the parties and has concluded that the facts are not in any significant dispute. It is clear from the record that the Hispanic

Commission is a social and community agency, one which is affiliated with a religious organization. There is some dispute as to whether the Commission is now in the process of being dissolved. Respondents Cueto and Nemikin are not priests of the Church, even though they allege that part of their mission is to care for the spiritual needs of their members. Bishops Paul Moore and Reuss-Froylan assert in their affidavits that they have met and communicated with both respondents to the subpoenas at issue; however, there is no allegation by any of the moving parties or their associates in the Church structure that any priest-penitent relationship exists between the Bishops and the respondents, or between the respondents and the members of the Hispanic Commission whom the government seeks to locate. Although the Bishops assert a confidentiality with respect to communications between themselves and the respondents, there is no indication that the government seeks to inquire into any such conversations; rather, the government seeks to discover what respondents know concerning the suspected FALN fugitives. This is not a case where the government seeks to pry into protected communications between a clergyman and his communicants, such as occurred in *In re Verplank, supra.* In that case the grand jury subpoenaed a minister and his aides who were thought to have engaged in counselling young persons with respect to the military draft. Despite the allegation of a priest-penitent privilege, the court upheld a modified subpoena against the minister. See 329 F.Supp. at 438.

A witness summoned before the grand jury may be excused from giving testimony only where a valid privilege can be asserted. Upon a review of all the submissions, the Court is compelled to arrive at the conclusion that the work performed by the respondents herein, while perhaps performed under spiritual auspices, is primarily in the nature of social work. A social worker has no privilege with respect to communications with a person who seeks his or her aid, Weinstein's Evidence ¶ 504[03] (1975). This Court is not free to extend the cloak of the priest-penitent privilege so far as to cover persons engaged in social work simply because the Hispanic Commission is affiliated with a religious organization.

It would be frivolous to suggest that their work in the Hispanic Commission confers upon respondents or their colleagues a license to commit crime, if indeed such occurred here. See *Branzburg v. Hayes, supra,* 408 U.S. at 691, 92 S.Ct. 2646. The Court has reviewed certain grand jury materials *in camera,* and is compelled to conclude that the actions of the government in this investigation seek to place no restraint upon what respondents choose to believe in their religion or their politics. It happens in this case that the government has uncovered certain peculiar common relationships between certain alleged members of the FALN, certain alleged members of the Hispanic Commission, and certain persons suspected of committing criminal acts in this district. Accordingly, the Court must conclude that even taking all the movants' factual allegations at face value, the actions of the government here do not appear to place any cognizable burden on the free exercise of any religious rights. However, since freedom of religion has been "zealously protected, sometimes even at the expense of other interests of admittedly high social importance", see *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972), the Court will enquire further into the first amendment rights asserted here by consideration of the freedom of association claim.

Decisions indicate that when the grand jury seeks to discover the names of members of an organization, the government must demonstrate some "meaningful relationship" between the organization and the witnesses summoned and the subject matter of the grand jury inquiry. See *Gibson v. Florida Legislative Investigative Commission,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Another court has suggested that when a grand jury seeks the names of the members of an organization who are suspected of committing crimes,

the government has thereby demonstrated a "compelling interest" sufficient to outweigh the possibility of infringement of associational rights. See *Glass v. Heyd,* 457 F.2d 562, 564 (5th Cir. 1972). The Court finds these principles to be applicable here.

It is clear from the public record in this case that the government is investigating a series of alleged common relationships between the membership of the Hispanic Commission, the membership of the FALN, and persons thought to have been associated with the Chicago "bomb factory". The names of two of these persons—Carlos Torres and Oscar Lopez—are known to all parties. The Court's *in camera* inspection of the grand jury materials indicates that the pattern is one which may connect other persons to the activities under investigation. Even from the movants' own accounts of their FBI interviews, it is clear to this Court that the government is proceeding with care, that the investigation is sharply focused, and that specific crimes and specific persons are under investigation. Thus, the government has shown a "substantial connection" between the information sought and the governmental interest, and that its investigation has been focused rather than broadly invading rights of free association. See *United States v. Bursey, supra,* 466 F.2d at 1085, 1088. Accordingly, to the extent that first amendment rights have been asserted on these motions, the Court concludes that the government's showing has demonstrated a sufficiently compelling state interest to outweigh any possible consequential effect upon the exercise of fundamental rights, if indeed any such effect is present. See *Branzburg v. Hayes, supra.*

Respondents Cueto and Nemikin further allege that the processes of the grand jury are being used for purely investigatory purposes, and that the prosecutor is employing the panel as an arm of the FBI.

While the historical powers of the grand jury are broad, since the panel operates in secrecy and to a great extent under the guidance of the prosecutor, opportunities for abuse of the subpoena power are ever present. The grand jury, an integral component of the judicial branch of government, has the power of compulsory process, a power the Congress has not chosen to grant to the investigative offices of the executive branch. The courts must be vigilant against abuse of the grand jury power, for any such abuse would tend to erode the division between the separate and independent branches of the federal government. See *Hoffman v. United States, supra; In re Stolar,* 397 F.Supp. 520 (S.D.N.Y.1975).

Thus, there are limits imposed upon the use of grand juries. The government may not employ the powers of the grand jury to enquire into matters solely for use in civil litigation. See *United States v. Doe,* 341 F.Supp. 1350 (S.D.N.Y. 1972). The prosecutor may not employ the subpoena power solely to summon witnesses to his office to conduct a private investigation. See *Durbin v. United States,* 94 U.S. App.D.C. 415, 221 F.2d 520, 524 (1954). Nor may the government employ the grand jury for the sole purpose of preparing an already pending indictment for trial. *United States v. DelToro,* 513 F.2d 656, 664 (2d Cir.) *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964).

In this case movants claim that the use of the grand jury to seek to locate possible fugitives from justice constitutes an abuse of the grand jury power. Two years ago this Court was called upon to pass upon a somewhat similar question. *In re Stolar,* 397 F.Supp. 520 (S.D.N.Y.1975) involved a case where the government insisted upon calling an attorney before the grand jury to ask him the address of a client who might know the whereabouts of a fugitive from justice. The court in *Stolar* noted that the client whose address was sought was in no sense of the word unavailable to the prosecutor; indeed, the attorney had offered to produce his client voluntarily before the FBI. It was upon the government's refusal to accept this offer, and the insistence that the attorney be called before the grand

jury, that this court concluded that abuse of process was present. See 397 F.Supp. at 522–23.

The factual distinction here is crucial. Carlos Torres is truly unavailable; there has been no offer to produce him for an informal interview. Accordingly, this case must be governed by the principle that the grand jury may properly be employed to locate other prospective witnesses, even when those persons may be fugitives from justice. See *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). As the Supreme Court stated in that case, "the Government may inquire of witnesses before the grand jury as to the whereabouts of unlocated witnesses . . . ." *Id.* at 488, 71 S.Ct. at 819; see also *In re Stolar, supra,* 397 F.Supp. at 523.

"The Grand Jury's scope of inquiry . . . is not limited to events which themselves may result in criminal prosecution, but is properly concerned with any evidence which may afford valuable leads for investigation of suspected criminal activity . . . ." (*United States v. Cohn,* 452 F.2d 881, 883 (2d Cir. 1971) (Kaufman, J.), *cert. denied,* 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249 (1972).)

Nor is the Court persuaded by movant's other claims of grand jury abuse. There is no impropriety in the fact that the documents produced by the Church were delivered to the FBI, or in the fact that the records were not immediately placed before the grand jury. See *United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519 (S.D.N.Y.1971). The statements attributed to the FBI agents to the effect that the agents believed respondents were not being forthright, and to the effect that respondents might be called before the grand jury, do not make out a showing of abuse of process. Such statements do not constitute prosecutorial misconduct. See *United States v. Chevoor,* 526 F.2d 178 (1st Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976).

The movants' claim of political harassment and prosecutorial misconduct are, in the final analysis, conclusory and unsupported by sufficiently detailed factual allegations to require a hearing on the question. As Chief Judge Coffin of the First Circuit wrote in a similar matter,

"While use of the grand jury for bad faith harassment of a political dissident with no expectation that any testimony concerning the commission of a crime would be forthcoming would constitute an abuse, that is not the situation in this case." (*In re Santiago,* 533 F.2d 727, 730 (1st Cir. 1976).

This Court is compelled to reach the same conclusion. Even without considering the government's *in camera* submission, the record demonstrates that there is a good faith and legitimate basis for the summoning of these two witnesses. Indeed, movants' own recollections of their FBI interviews demonstrate that they may possess knowledge pertinent to the inquiry. Accordingly, the Court must conclude that the movants have failed to demonstrate even the mere possibility that the grand jury is being improperly employed by the prosecutor.

Thus, under settled principles of law the motion for discovery of FBI records, and for an evidentiary hearing on the abuse of process claim, must be denied. A mere claim of improper grand jury process is not even sufficient to require the government to respond; nor does it indicate that any hearing is necessary. See *In re Millow,* 529 F.2d 770, 775 (2d Cir. 1976). The movants have failed to demonstrate any "compelling necessity" or "particularized need" such as would justify a wholesale intrusion into the grand jury proceedings. See *United States v. Gonzalez,* 38 F.R.D. 326 (S.D.N.Y.1965).

"Absent evidence of the probability of abuse of grand jury process, there is no right to intrude into the secrecy of grand jury proceedings in order that one may be heard concerning the propriety of a proposed investigation." *In re Grand Jury Investigation (General Motors Corporation)* 32 F.R.D. 175, 181 (S.D.N.Y.1963) (Edelstein, C. J.)

Movants also cite *Bursey v. United States, supra,* for the proposition that they

have a right to inspect the FBI interview records prior to testifying before the grand jury, lest they be subject to prosecution for false statement. However, *Bursey* does not stand for the proposition cited. Rather, in that case the court concluded that a witness had a due process right to see prior *grand jury* testimony prior to answering repetitive questions. See 466 F.2d at 1080. A grand jury witness has no right to inquire into the sources underlying questions asked of the witness, see *Ciffo v. McClosky*, 273 F.Supp. 604 (S.D.N.Y.1967), nor does a prospective witness have a right to inspect other evidence presently before the panel, even where the witness may be a target of the investigation. See *United States v. Winter*, 348 F.2d 204 (2d Cir.), *cert. denied*, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). Accordingly, the movants' motion for a hearing and for inspection of FBI interview sheets must be denied. *In re Millow, supra; In re Santiago, supra.*

 The Court concludes that the arguments advanced by respondents Cueto and Nemikin and by the intervenor Diocese in support of their motions are without merit. With the rarest possible exceptions, no one is immune from appearance before the grand jury. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *In re Kinoy*, 326 F.Supp. 400 (S.D.N.Y. 1970).

The motions to quash are denied in all respects. The motion to inspect and for a hearing are also denied. Respondents Cueto and Nemikin are hereby ordered to appear before the grand jury forthwith to be sworn and to answer all questions duly put to each of them.

SO ORDERED.