In the Matter of Robert F. MORGAN, Director of Finance Summa Corporation d/b/a Frontier Hotel, Las Vegas, Nevada, Witness Before the Federal Grand Jury.

No. M 11–188.

United States District Court,
S. D. New York.

May 29, 1974.

Paul J. Curran, U. S. Atty., S.D.N.Y., for the U. S.; John M. Dowd, Sp. Atty., Organized Crime and Racketeering Section, and Bart M. Schwartz, Asst. U. S. Atty., of counsel.

Davis & Cox, New York City, David M. Disick and Lawrence S. Burstein, New York City, of counsel and Andrews, Kurth, Campbell & Jones, Houston, Tex., Milton H. West, Jr., and Daryl B. Crown, Houston, Tex., of counsel, attorneys for Summa Corporation.

GURFEIN, District Judge:

Robert F. Morgan, Director of Finance of the Summa Corporation ("Summa"), a witness before the Special Grand Jury has moved to quash a Grand Jury subpoena duces tecum calling for the production of certain records of the Frontier Hotel and Casino ("Frontier") in Las Vegas, Nevada, which is owned by Summa.

The grounds for the motion to quash are that:

(1) Compliance with the subpoena would be unreasonable and oppressive because it is not relevant to the inquiry being conducted or to the federal crimes under investigation; it is burdensome and oppressive because the Frontier would suffer serious damage to its business if required to produce the documents demanded, since the interviewing of its gambling customers would tend to keep them from returning to gamble at the Frontier.

(2) The issuance of the subpoena constitutes an abuse of the Grand Jury process because the Grand Jury is allegedly being used for the purpose of gathering information for use in a civil case or for use in civil and criminal cases concurrently.

The subpoena duces tecum demands the production of the following records:

"1. Records of all Junkets, Tours, Groups or other arrangements for the years 1971 and 1972 brought in by [John Doe] which reflect.: [1]

(a) The amount of front money by individual name of Junketeer and date of Junket, Tour, Group or other arrangement.

(b) Repayment of front money by individual name of Junketeer and date of Junket, Tour, Group or other arrangement.

(c) Date of arrival, departure and city of origin.

2. Records of all collections on markers, IOUs and checks by [John Doe] for the years 1971 and 1972 to include but not limited to:

(a) Markers, IOUs or check lists.

(b) Memorandums of transmittal.

(c) Information on all Casino Bank Accounts used by [John Doe] for processing of collections, including deposit tickets, cancelled checks and bank statements."

There is agreement that legal gambling is conducted at the Frontier, that Morgan is its Director of Finance and that junkets of gamblers come to Las Vegas under the guidance and solicitation of a "junket representative."

A junket, under Nevada Gaming Commission Regulation 25 is defined as a group of eight or more persons who travel to Nevada pursuant to arrangements made by a junket representative for the purpose of engaging in gaming acitivities in a particular hotel. The junket representative receives a fee

1. To preserve the secrecy of the Grand Jury proceeding, the name is elided and "John Doe" is substituted.

from the hotel. One such junket representative is John Doe.

It is further agreed that the investigation is being conducted by Strike Force 18 in conjunction with the Intelligence Division of the Internal Revenue Service and the Federal Bureau of Investigation.

The Government has tendered an affidavit by John M. Dowd, a Special Attorney in the Department of Justice in charge of Strike Force 18. Mr. Dowd avers that Strike Force 18 is conducting criminal investigations of junket organizers from Las Vegas, Nevada and foreign casinos. He relates that the Special Grand Jury has been conducting investigations and hearing testimony concerning junket organizers since February, 1974 with respect to violations of 26 U.S.C. §§ 7201, 7206(1) and 7206(2) [2] and 18 U.S.C. §§ 2314,[3] 371,[4] 1962 [5] and into possible obstruction of justice in connection with its own inquiries, in violation of 18 U.S.C. § 1503.[6] He avers further that this Special Grand Jury continues the work of a previous Special Grand Jury impanelled pursuant to the Organized Crime Control Act of 1970 (Pub.L. 91–452, Title I, Section 101(a), Oct. 15, 1970, 84 Stat. 923), (18 U.S.C. § 3331(a)), which handed down an indictment in United States v. Parness, 73 Cr. 750 (S.D.N.Y.) that involved alleged violations of 18 U.S.C. §§ 2314 and 1962 (referred to above).

In describing junket operations, Mr. Dowd states that, among other things: (1) The junket organizer pays the air fares for players for which he is reimbursed by the hotel. Wives pay air fare to the junket organizer. (2) The organizer gets credit information on the players that he transmits to the hotel which establishes a line of credit for the player. The player signs "markers" which are returned to him when he pays his gambling debt. (3) A player may, in lieu of playing on credit, deposit with the junket representative before leaving on the junket "front money" which the latter banks in the casino cage. If, at the end of the junket, the player has not exhausted his front money, he gets the balance back from either the casino or the junket organizer.

The Special Attorney finally avers that, in his judgment, the specific records called for by the subpoena duces tecum have significant bearing on the inquiry of the Grand Jury.

The witness contends that all of the foregoing does not establish that the documents called for by the subpoena are relevant, and that the Government is in error about the amount of money handled by John Doe. He tenders an affidavit of Dorothy Louise Hughes, the Frontier Casino Cage Manager, which purports to describe the junket operations as conducted at the Frontier. She states: (1) Front money is either collected by the junket organizer for deposit on arrival or the junketeer deposits it at the Frontier himself. (2) Front money is refunded directly to the junketeer, not through John Doe. (3) Frontier assumes responsibility for collection of markers and IOUs, and John Doe does not assume it, except in a few instances at the specific request of Frontier, John Doe thus assuming responsibility for the collection of only some 3% of the total amount of credit play.

The extent of the relevancy required to be shown to support a Grand Jury subpoena must, therefore, be considered.

## I

The scope of a Grand Jury subpoena and its relevancy has a history of its own. The courts have gone from the conception in Boyd v. United States, 116 U.S. 616, 621–622, 6 S.Ct. 524, 29 L.Ed. 746 (1886), that a subpoena duces tecum may violate the Fourth Amendment to

---

2. These sections relate to income tax evasion.

3. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting.

4. Conspiracy.

5. Racketeering, collection of unlawful debts.

6. Influencing or injuring officer, juror or witness.

the language of United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), in which Fourth Amendment protection was limited to a subpoena "too sweeping in its terms 'to be regarded as reasonable.'" 410 U.S. at 11. As Judge Friendly pointed out in his review of the history of the Grand Jury subpoena duces tecum in In re Horowitz, 482 F.2d 72, 79 (2 Cir. 1973), it may be that "restriction on overbroad *subpoenas duces tecum* rests not on the Fourth Amendment but on the less rigid requirement of the due process clause."

Though the applicability of the Fourth Amendment to Grand Jury subpoenas is not necessarily moribund, the Supreme Court and this Circuit seem to be tending away from anything less than sheer overbreadth as calling for a constitutional limitation. See United States v. Doe (Schwartz), 457 F.2d 895 (2 Cir. 1972), cited with approval in United States v. Dionisio, *supra*, 410 U.S. at 15, 93 S.Ct. 764.

■ Yet, aside from constitutional considerations, a witness does have standing to move to quash a subpoena duces tecum, Dionisio, *supra*, 410 U.S. at 12, 93 S.Ct. 764, even if its direction to produce is not equivalent to a "seizure." See F.R.Crim.Proc. 17(c). The clash of interests is between the needs of the Grand Jury, leeway in the exploration of criminal conduct with the aid of witnesses, secrecy, speed, and the absence of roadblocks based upon recurring demands of privacy and the right to privacy.

In concrete terms, we have been told that the solution in each case turns upon the facts. Yet, we must confess that there are undercurrents if not of controlling authority, at least of tendency. One need only look at the approach of the Second Circuit in United States v. Doe, *supra*, and that of the Seventh Circuit in In re Dionisio, 442 F.2d 276 (7 Cir. 1971), reversed in United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L. Ed.2d 67 (1972), to recognize that value judgments of the relative interests involved play a large part in the decision.

We have now come to the point where the Supreme Court in *Dionisio* has said: "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws" 410 U.S. at 17, 93 S.Ct. at 773; and where the Third Circuit in In re Grand Jury Proceedings (Schofield), 486 F.2d 85, 93 (1973), nevertheless, has suggested that the Government's affidavit supporting relevancy should be disclosed to the witness, with a right on the part of the witness to seek discovery "for additional information which might cast doubt upon the accuracy of the Government's representations"—a suggestion which Chief Judge Seitz, concurring, felt "would lead to the type of minihearing which the Supreme Court condemned in *Dionisio*." 486 F.2d at 94.

■ The witness Morgan presses on me strongly that *Schofield* should be followed, and that it supports an evidentiary hearing. I must decline to order the evidentiary hearing requested. I recognize, to be sure, that where the subpoena calls for an indiscriminate production of uncategorized documents in file cabinets the District Court must determine which are potentially relevant. In re Horowitz, *supra*, 482 F.2d at 79. But even in the case of a demand for wholesale production, the burden, in this Circuit at least, is cast upon the person seeking to quash to satisfy the District Judge "that a particular category of documents can have no conceivable relevance to any legitimate object of investigation by the federal grand jury." (482 F.2d at 80).

In the matter at issue, no picking and choosing has to be done. All the documents are relevant or none is. The papers sought are clearly denominated. There is no call for filing cabinets full of unsorted stuff. The limited issue is how far the Government must go in a showing of relevancy to sustain an otherwise clear subpoena duces tecum.

The witness claims that he has torn to shreds the Government's claim of relevancy by "showing" that John Doe could not have had the opportunities to touch money in the manner conceived of by the Department of Justice. The Court could, indeed, make a determination on the basis of affidavits but that would properly invite a jousting on the merits —nothing less than the minitrial frowned upon by the Supreme Court. To do less, on the other hand, would require the Court to accept as truth facts tendered by an interested party, a procedure quite out of keeping with the traditional ex parte nature of the investigation conducted by grand juries. Hale v. Henkel, 201 U.S. 43, 58–66, 26 S.Ct. 370, 50 L.Ed. 652 (1906); United States v. Scully, 225 F.2d 113, 116 (2 Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955).

As in so many matters of judicial inquiry, the solution may turn on the burden of proof. The Government has asserted that the Grand Jury is investigating junket operators, that a predecessor Grand Jury has already indicted one of that calling and that it believes its own inquiry may have been obstructed unlawfully. It is true that this tells us nothing of why John Doe is suspect or even what innuendo makes him a possible target. Yet there may be connections among junket operators it would be incautious to expose to public knowledge. Conspiracy charges have often been compared to mosaics. The question is whether the prosecutor must show how each new tile fits the tiles already in place. A Grand Jury could not function as a body engaged in secret investigation if that were the test.

 Relevancy, in the context of a Grand Jury proceeding is not a probative relevancy, for it cannot be known in advance whether the document produced will actually advance the investigation. It is rather a relevancy to the subject matter of the investigation. Records of who the junketeers were and their gaming activities are relevant to an investigation of a junket representative. The disclosure that the investigation is of a named junket representative supplies a barely sufficient nexus for the relevancy of financial records related to his activities. It is not necessary to define with precision the section of the statute thought to have been violated, for it is not the business of the witness to circumscribe the Grand Jury. Blair v. United States, 250 U.S. 273, 282, 39 S. Ct. 468, 63 L.Ed. 979 (1919).

 If the prosecutor is wrong about John Doe's financial relationship to the Frontier and nothing comes of the investigation, the Frontier's business may have been hurt, seemingly to no purpose. But the duty to supply information is not limited by a calculation of the probabilities of the Grand Jury finding a true bill. For the public good, the scales must tip in favor of the duty of the Special Grand Jury "to inquire into offenses against the criminal laws of the United States" 18 U.S.C. § 3332, except where the burden cast upon the witness is oppressive in terms of the overbreadth of the subpoena or he has a recognized privilege. In words quoted by Wigmore, "the public has the right to every man's evidence." 8 Wigmore on Evidence § 2192 (1961). That duty "is usually paramount over any private interest which may be affected." McMann v. S.E.C., 87 F.2d 377, 378 (2 Cir. 1937).

## II

 The witness charges that the Grand Jury subpoena is being improperly used to obtain evidence in a civil tax case against John Doe. He avers by the affidavit of Charles Heim, the Tax Manager of Summa, that Summa in March 1974 was served with an IRS summons "in the matter of the tax liability of [John Doe]," and was told that the information was requested pursuant to an investigation conducted by Strike Force 18. Upon refusal by Summa to produce certain documentation now requested, the Grand Jury subpoena in issue was served upon it commanding the production of the same materials, except that

production was to cover the year 1971 as well as 1972.

Upon the argument the Court asked the Government to explain the relationship between the IRS summons and the later Grand Jury subpoena. Mr. Dowd replied by affidavit that on March 26, 1974 and April 15, 1974, a Special Agent of the Internal Revenue Service caused to be issued two administrative subpoenas to the above-named witness "as part of an ongoing criminal investigation of [John Doe]."

He states further that "[u]pon notice that Summa Corporation refused to produce certain documents and upon receipt of certain information concerning [John Doe's] activities, this case was considered ripe for grand jury action and ought to be made part of its ongoing investigations. Accordingly, your affiant caused to be issued, the instant Grand Jury subpoena." He specifically disavows that the Grand Jury is assisting any civil investigation. The Grand Jury and the prosecutor should adhere to that restriction. See United States v. Doe, 341 F.Supp. 1350 (S.D.N.Y.1972).

It is probably true that Grand Jury process may not be used in aid of any civil matter, although the precise holding in United States v. Procter & Gamble, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L. Ed.2d 1077 (1958), was only that this would flout the law in Sherman Act cases where Congress has provided that "the taking of depositions . . . shall be open to the public." 37 Stat. 731, 15 U.S.C. § 30.

Assuming that such a policy would apply generally, there does not appear to have been a breach here. "[U]nder § 7602 [Title 26] an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution." Donaldson v. United States, 400 U.S. 517, 536, 91 S.Ct. 534, 545, 27 L.Ed.2d 580 (1971). There is no contention that there has been a recommendation for prosecution of John Doe. As the Supreme Court noted in *Donaldson, supra,* any decision to recommend prosecution by the Internal Revenue Service comes only after the investigation "is sufficiently far along to support appropriate conclusions." 400 U.S. at 535.

On the other hand, the practice of using an administrative summons by a Special Agent in conjunction with the work of a Strike Force investigating crime does seem anomalous, and such a practice, perhaps, goes further than the Supreme Court intended to sanction in *Donaldson, supra.*

■ The validity of the *summons* is not before me, however. The validity of the Grand Jury *subpoena* is. In view of the apparently continuing interest in making a criminal tax case against John Doe, as evidenced by the early reference to Strike Force 18, it is hard to conclude that the Grand Jury subpoena was not issued in a criminal investigation. The Grand Jury may commence a criminal tax investigation on its own, without formal recommendation to the Department of Justice by the Internal Revenue Service. Sullivan v. United States, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954).

I have not ignored the circumstance that the code sections involving criminal violations of the tax law which originally appeared on the Grand Jury subpoena were stricken before it was served. This could imply either that the subpoena was for a purpose different from investigation of tax evasion or that the Strike Force misapprehended the state of the law and struck the sections from the subpoena out of timidity. In either case, the subpoena stands on its own as a valid exercise of the power of the Grand Jury to investigate criminal offenses.

The motion to quash is denied.