**In re April 25, 1978 Grand Jury Subpoena Duces Tecum served upon Jacob GRU-BERG as Secretary-Treasurer of Ulster Electric Supply Company, Inc.**

**No. M11–188.**

United States District Court, S. D. New York.

July 5, 1978.

Robert B. Fiske, Jr., U. S. Atty., David C. Patterson, Asst. U. S. Atty., New York City, for United States.

Rogers & Wells, New York City, for Ulster Elec. Supply Co., Inc.; Charles A. Simmons, Victor F. Ganzi, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Ulster Electric Supply Company, Inc. ("Ulster") moves to quash a subpoena served upon Jacob Gruberg, its Secretary-Treasurer, by the May 1978 additional grand jury, currently sitting in this District, and to terminate as invalid the grand jury investigation underlying that subpoena. This relief was sought pursuant to Rules 17 and 47, F.R.Cr.P. The motion was made returnable on May 23, 1978 before Judge Griesa, then sitting in Part I of this Court. On May 31, 1978 Judge Griesa stayed the enforcement of subpoena, pending further order of the Court. Owing to the press of other emergency matters, Judge Griesa was not able to decide the motion before his schedule required him to be absent from Court. In these circumstances, Judge Griesa has referred the pending motion to the undersigned, his successor in Part I. I have carefully reviewed all affidavits, documents and authorities submitted to Judge Griesa.[1] For the reasons stated below, the motion is denied in its entirety, and the order staying enforcement of the grand jury subpoena is vacated.

---

1. The Court has examined the following: Ulster's Notice of Motion dated May 15, 1978; affidavits of Charles A. Simmons and Victor F. Ganzi verified May 12, 1978, in support thereof; the exhibits to those affidavits; Ulster's main and reply briefs; affidavit of David C. Patterson, Assistant United States Attorney, verified May 23, 1978, in opposition to the motion, and exhibits thereto (some of these were viewed *in camera*); Mr. Ganzi's supplemental affidavit verified May 22, 1978; and several letters forwarded by counsel to Judge Griesa, with enclosures (Government's letters of May 31, June 1, June 13, and June 15; Messrs. Rogers & Wells' letters of June 9 and June 12, 1978); Government's brief.

## I.

In February of 1975, the Intelligence Division of the Internal Revenue Service ("IRS") commenced an investigation for possible fraud against Ulster, Gerald Gruberg, its President, and his brother Jacob Gruberg, the corporation's Secretary-Treasurer. Ulster is a wholesale and retail electrical supply outlet, with business locations in both Kingston and Poughkeepsie, New York. The interest of the IRS agents was first attracted by Ulster's corporate income tax return for the year 1973. In particular, evidence of possible criminal violations has centered upon Ulster's purchase journal for 1973, which reflects a series of purchases by the company in December of 1973, totalling $350,000, and which were claimed on the 1973 tax return as a deduction for the cost of goods sold. The Government contends, in opposing the present motion, that the records of the suppliers from whom these purchases were allegedly made "reveal that the purchases were never made, and are in fact fictional." [2] Subsequently the IRS inquiry extended into Ulster's tax returns for the years 1971, 1972 and 1974.

The firm of Rogers & Wells was retained by Ulster in connection with the IRS audit of the company and subsequent inquiries. Messrs. Charles A. Simmons and Victor F. Ganzi, associated with that firm, filed the requisite powers of attorney on February 4, 1975. Thereafter a number of meetings were held between the IRS agents in charge of the case and counsel, as the result of which numerous documents were produced by Ulster for examination and copying by the IRS. There were six such meetings for the delivery of documents, the first occurring on April 21, 1975 and the last on November 6, 1975.[3]

The IRS agents also made efforts, unsuccessful in these instances, to interview individuals at Ulster who could shed further light upon what the documents revealed. Special agent Anthony A. Cesare, the special agent in charge of the inquiry, attempted on September 20, 1975 to interview Grace Claire Ede, Ulster's bookkeeper, at her home in Kingston. Mrs. Ede advised that she would not answer any questions without having first consulted with her attorney. The IRS thereupon served an administrative summons upon Mrs. Ede. There ensued an exchange of telephone communications between agent Cesare and Mr. Simmons (who now represented Mrs. Ede as well as Ulster), in which the communicants debated whether a United States District Court stenographer would transcribe the interview (as Mrs. Ede requested) or whether the transcript was made by a stenographer who was an employee of the IRS (as the agent insisted).[4] While on this motion Ulster devotes considerable effort to criticizing the IRS in this debate over stenographers, the issue appears to generate more heat than light, in view of the fact that on October 8 Simmons advised Cesare that, in any circumstances, Mrs. Ede intended to assert her Fifth Amendment and other constitutional privileges, a refusal to testify in which she presumably would have persevered had the stenographer been the Angel Gabriel himself.

In meetings held between the IRS agent and counsel in April, June and July of 1975, the agent also inquired as to whether Gerald Gruberg would voluntarily appear for questioning and voluntarily produce his own records. Counsel responded, on each of these occasions, that the request would be considered only upon completion of examination of Ulster's books and records, which as noted *supra* had been made available by counsel for Ulster to the IRS.[5]

The agents also expressed interest in interviewing Josephine Bloom, another bookkeeper employed by Ulster. Mr. Simmons then identified himself as counsel for Ms. Bloom as well. While the affidavits do not reflect what precise position was taken by counsel in response to the request, it does

---

2. Patterson affidavit, at ¶ 11.

3. Simmons affidavit, at ¶¶ 3–14.

4. See Ex. G to Simmons affidavit.

5. Simmons affidavit, at ¶¶ 19–20.

not appear that Ms. Bloom consented to be interviewed.[6]

The IRS agents and their superior officers concluded, at this juncture, to request that the case be referred to the United States Department of Justice for further proceedings before a federal grand jury. That request takes the form of a letter dated February 9, 1976, addressed by the Regional Counsel of IRS in New York to the Hon. Scott P. Crampton, the Assistant Attorney General in charge of the Tax Division of the Department of Justice in Washington. That letter has been examined by the Court *in camera.* The IRS, in its February 9, 1976 letter, refers to the Department of Justice income tax cases involving Ulster and the two Grubergs, in respect of the alleged "overstatement of purchases by Ulster . . . on its corporate income tax return for the year 1973 . . . ." IRS coupled its reference with the recommendation:

> " . . . that a grand jury investigation be conducted to provide evidence of criminal violations of *Int.Rev.Code of 1954,* § 7201 (hereinafter cited as *Code* ) with a view toward the return of indictments against Gerald Gruberg and Jacob Gruberg for attempting to evade and defeat the corporate income tax liabilities of Ulster for the year 1973. It is also recommended that this grand jury inquiry be focused toward the development of evidence of *Code* § 7206(1) violations against Gerald Gruberg and *Code* § 7206(2) violations against Gerald and Jacob Gruberg for subscribing to and aiding and abetting in, respectively, the preparation of a false return for Ulster for the year 1973."

The IRS called the particular attention of the Department of Justice to the statute of limitations applicable to the "institution of criminal proceedings" as to Ulster, and the establishment of possible "criminal violations" concerning the individual income tax liabilities of the Grubergs. After a review of certain evidence uncovered during the IRS inquiry, the IRS stated to the Department of Justice:

> "We note that jurisdiction of the tax aspects of the proposed grand jury investigation remains with the Internal Revenue Service and the Tax Division, Department of Justice, and that prospective recommendations under Title 26, stemming from the investigation, will be processed in the regular manner. If the grand jury proceedings are instituted, we request that at the conclusion thereof, and subsequent to the securing of a rule 6(e) order, Fed.R.Crim.Proc., the data generated by the grand jury be submitted to the Internal Revenue Service for inclusion with other information and processing through the normal service channels."

The Assistant Attorney General responded to the IRS request in a letter dated October 14, 1976, addressed to the United States Attorney for this District. The Assistant Attorney General refers to the recommendation of the IRS that "a grand jury investigation be conducted to provide evidence of criminal violations"; he recommends to the United States Attorney that the grand jury inquiry be focused "toward the development of evidence" of violations of the criminal provisions of the Internal Revenue Code; the United States Attorney is requested to commence such a grand jury investigation for the year 1973; and the United States Attorney is directed to return the transcripts of testimony taken before the grand jury to Washington, "so that we may determine whether prosecution in this case is warranted. Under no circumstances should an indictment be sought without authorization from this office."

To this task, the May 1978 additional grand jury in due course addressed itself. The subpoena forming the subject matter of the present motion was served on May 1, 1978 by IRS agents, under the direction of Assistant United States Attorney Patterson, upon Jacob Gruberg, the Secretary-Treasurer of Ulster. The subpoena required Gruberg to appear before the grand jury on May 15, 1978, and produce Ulster's

---

6. Patterson affidavit, at ¶ 11.

purchase journals, general ledgers, general journals, and accounts payable subsidiary ledgers for the years 1971, 1972, 1973 and 1974. Following adjournment of the return date of the subpoena to June 2, 1978, Ulster filed its present motion, seeking to quash the subpoena and terminate the grand jury investigation.

## II.

On this motion, Ulster launches a broad attack upon the so-called "open-ended" grand jury proceedings which were contemplated by the Internal Revenue Manual as effective until November 21, 1977, and which formed the background of the quoted exchange of correspondence between IRS and the Department of Justice in February and October of 1976. The "open-ended" grand jury proceedings are described in § 9267.4(1) of the Internal Revenue Manual, set out in the margin;[7] that section goes on to describe the steps by which a criminal reference letter is prepared and eventually forwarded to the Tax Division of the Department of Justice. Section 9268 of the Manual, also as effective prior to November 21, 1977, directs special agents of IRS to interview grand jury witnesses following their appearance before a grand jury, in an effort to obtain "the same information which the witness furnished to the grand jury", thereby doing away, in the case of a cooperating witness, with "any question of grand jury secrecy and the Service use of the grand jury testimony for both criminal and civil purposes . . ." If the witness refuses to respond to the agent's question, the Manual goes on to observe, the United States Attorney should be asked to obtain a court order under Rule 6(e), F.R. Cr.P., to authorize the Service "use of the grand jury testimony for both criminal and civil purposes." The Manual particularly warns agents that although special agents may have access to information arising from a grand jury investigation, and may utilize it for criminal investigative purposes, the information cannot be used for civil purposes, in the absence of cooperation of the witness or other circumstances, such as a court order under Rule 6(e).

Effective October 1, 1977, Rule 6(e) was amended in certain respects discussed *infra*. The Internal Revenue Manual was revised effective November 21, 1977. Section 9267, dealing with grand juries, was amended by a new § 9267, which commences with the observation that: "the Service is conducting a comprehensive review of the relationship of the Service and the Federal grand juries." Pending completion of that review, certain guidelines are given to IRS agents, which revise certain procedures in manners not directly pertinent, but which reiterate the fact that grand jury information "may not be used for civil purposes without a Federal Rules of Criminal Procedures 6(e) Order which specifically authorizes the use of such information for civil purposes." Amended § 9267(2).

Thus the initial letter of reference from the IRS to the Department of Justice on February 9, 1976, and the Department's letter of instruction to the United States Attorney for this District on October 14, 1976, are cast in terms of commencing a grand jury inquiry into possible criminal violations of the tax laws. The provisions in the Internal Revenue Manual, which existed both prior and subsequent to their amendment on November 21, 1977, are painstaking in their efforts to make special agents of the IRS understand that information obtained as the result of a grand jury proceeding may not be used in civil proceedings in the absence of an appropriate court order. Finally, the affidavit of Assistant United States Attorney Patterson, describing the pending grand jury investigation, states explicitly that the grand jury's inves-

---

7. § 9267.4(1) provides:

"Occasionally, investigations into areas of noncompliance are stymied by a series of reluctant witnesses, and it is not possible to determine the precise limits of the tax violations in terms of defendants and taxable peri- ods. If such investigations become stymied, and it appears that an open-ended grand jury inquiry would probably develop information which would result in prosecution recommendation(s), the special agent should submit a complete report to the Chief . . ."

tigation relates to possible violations of federal criminal law; that the office of the United States Attorney will supervise the presentation to the grand jury; and that the Department of Justice will determine whether an indictment should be sought, albeit in consultation with IRS.[8]

Ulster contends that this grand jury procedure, as implemented in the present case, constitutes an abuse of the grand jury system which cannot be tolerated. It is said that the "open-ended" grand jury procedures permit federal prosecutors to use the grand jury to conduct an IRS administrative investigation; that the procedure violates limitations on the investigatory powers of the IRS by usurping the special investigatory powers of the grand jury; and that, assuming the validity of an open-ended grand jury in limited circumstances, those circumstances have not been demonstrated in the case at bar.

■ The Court finds no merit in any of these contentions.

### III.

■ We may recognize at the outset that certain limitations exist with respect to the use of grand juries, which the courts in the exercise of their supervisory powers will enforce. In *Matter of Wood,* 430 F.Supp. 41, 47 (S.D.N.Y.1977), Judge Pierce said for this Court:

> "Thus, there are limits imposed upon the use of grand juries. The government may not employ the powers of the grand jury to inquire into matters solely for use in civil litigation. See *United States v. Doe,* 341 F.Supp. 1350 (S.D.N.Y.1972). The prosecutor may not employ the subpoena power solely to summon witnesses to his office to conduct a private investi-

gation. See *Durbin v. United States,* 94 U.S.App.D.C. 415, 221 F.2d 520, 524 (1954). Nor may the government employ the grand jury for the sole purpose of preparing an already pending indictment for trial. *United States v. DelToro,* 513 F.2d 656, 664 (2d Cir.) cert. denied, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964)." [9]

In the case at bar, Ulster contends in essence that the grand jury is being used to inquire into matters for use in civil litigation, a practice condemned by this Court in *United States v. Doe,* 341 F.Supp. 1350 (S.D.N.Y.1972), cited by Judge Pierce in *Wood* and relied upon by Ulster in the case at bar.

In *Doe,* Judge Frankel considered a Justice Department's application under Rule 6(e), F.R.Cr.P., that IRS agents be granted access to books and records, subpoenaed or to be subpoenaed in future, before a grand jury, and to the testimony of witnesses already taken or to be taken before the grand jury, in order to determine whether there had been criminal violations, and also "to determine civil tax liability." In his affidavit supporting the application, the Department of Justice attorney characterized his request as being for the purpose of determining, *inter alia,* whether there had been criminal or civil violations of Title 26, United States Code; and whether there are "additional civil tax liabilities due and owing to the United States."

In the light of this language, Judge Frankel denied the application under Rule 6(e). He found pertinent authority in dicta contained in *United States v. Procter & Gamble,* 356 U.S. 677, 683, 78 S.Ct. 983, 987,

---

8. Patterson affidavit, at ¶¶ 10, 15, 17–18. The Internal Revenue Manual effective prior to November 21, 1977 contains, at § 9627.4(7):

> "The United States Attorney or the Strike Force Attorney will be advised that jurisdiction of the tax aspects remains with the Internal Revenue Service and the Tax Division, Department of Justice and that prosecutive recommendations under Title 26 will be processed in the regular manner."

It is apparent, however, from the other material in the record that the final prosecutive say rests with the Tax Division of the Department of Justice.

9. In *Wood* Judge Pierce denied the motion to quash grand jury subpoenas. The witnesses were ultimately held in contempt and incarcerated, a result affirmed by the Second Circuit. *In re Cueto,* 554 F.2d 14 (2d Cir. 1977).

2 L.Ed.2d 1077 (1958), to the effect that "criminal procedures to elicit evidence in a civil case . . . would [flout] the policy of the law." Judge Frankel also referred to Justice Harlan's dissent in *Procter & Gamble,* wherein he stated that he read the majority opinion to say that it would be a "misuse of the grand jury process" if a "grand jury investigation [were] *instituted* solely in aid of a civil suit—that is without any thought of obtaining an indictment . . . ."

In the light of these pronouncements, Judge Frankel concluded in *Doe* that grand jury investigations, to remain within the bounds of propriety, must be "in their inception exclusively criminal." 341 F.Supp. at 1352. Given that premise, he held that the grand jury investigation in *Doe,* concededly going forward for the partial purpose of determining whether additional civil tax liabilities existed, was improper. His opinion observes:

> "Nothing said herein is meant to overlook the Supreme Court's realistic observation that evidence acquired in a legitimate grand jury inquiry may later be usable even though it has been concluded that no indictment should issue. See *Procter & Gamble,* supra, 356 U.S. at 684, 78 S.Ct. 983. That is wholly different from the proposition that the inquiry may start out or continue with the explicit purpose of discovering evidence for civil claims." 341 F.Supp. at 1352.

A motion under Rule 6(e) seeking an order directing a United States Attorney to make grand jury materials available to IRS agents was also involved in *In Re July 1973 Grand Jury,* 374 F.Supp. 1334 (N.D.Ill.1973), in which Judge Frankel's opinion in *Doe* was distinguished and the Rule 6(e) motion granted. In the *1973 Grand Jury* case, the grand jury had returned indictments before the Rule 6(e) application was made; the court recognized the general rule that "material properly obtained by the grand jury can be used in a subsequent civil proceeding by the office of the United States Attorney or another branch of the Justice Department." *Id.* at 1337. *Doe* was discussed in these terms:

"In *United States v. John Doe,* supra, the court found that the purpose of the grand jury investigation was 'ab initio the exploration of possible civil claims.' 341 F.Supp. at 1351. In *John Doe,* no criminal indictment had been returned and the real danger was that the grand jury was being used to obtain evidence in a civil case, a prospect which quite properly made Judge Frankel react with shock and fear." *Id.* at 1336.

Unlike the two cases just cited, the case at bar does not involve an application by the Department of Justice pursuant to Rule 6(e) to make grand jury evidence available to other agencies. Rather, Ulster by its present motion seeks to quash a grand jury subpoena, and to terminate the grand jury investigation itself, as invalid and illegal. Judged by the relief sought in the motion, the decision of District Judge Gurfein (as he then was) in *In re Morgan,* 377 F.Supp. 281 (S.D.N.Y.1974) bears a closer resemblance to the case at bar. In *Morgan,* a witness before a grand jury moved to quash a grand jury subpoena duces tecum on the ground, *inter alia,* that issuance of the subpoena constituted an abuse of the grand jury process "because the grand jury is allegedly being used for the purpose of gathering information for use in a civil case or for use in civil and criminal cases concurrently." 377 F.Supp. at 282. The witness demonstrated by affidavit that the corporation in question was served with an IRS summons "in the matter of the tax liability" of a certain "John Doe", and that upon refusal of the corporation to produce the documentation requested, the grand jury subpoena in issue was served upon it, commanding the production of the same materials, except that the scope of the demand was expanded to include an additional year. The court directed the government to explain the relationship between the IRS summons and the subsequent grand jury subpoena. Government counsel responded by affidavit that an IRS agent had caused the administrative summons to be issued "as part of an ongoing criminal investigation" of the individual concerned; and that the

government attorney himself (a member of the Strike Force) directed issuance of the grand jury subpoena following a determination that the case was ripe for grand jury action and ought to be made part of its ongoing investigations. Judge Gurfein said of government counsel's affidavit:

> "He specifically disavows that the Grand Jury is assisting any civil investigation. The Grand Jury and the prosecutor should adhere to that restriction. See *United States v. Doe*, 341 F.Supp. 1350 (S.D.N.Y.1972)." 377 F.Supp. at 286.

In these circumstances, Judge Gurfein saw no basis for preventing the grand jury from proceeding with its historic function of inquiring into possible criminal activity. His opinion in *Morgan* holds:

> "The validity of the *summons* is not before me, however. The validity of the Grand Jury *subpoena* is. In view of the apparently continuing interest in making a criminal tax case against John Doe, as evidenced by the early reference to Strike Force 18, it is hard to conclude that the Grand Jury subpoena was not issued in a criminal investigation. The Grand Jury may commence a criminal tax investigation on its own, without formal recommendation to the Department of Justice by the Internal Revenue Service. *Sullivan v. United States*, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954)." 377 F.Supp. at 286.

The grand jury subpoena, the court concluded, "stands on its own as a valid exercise of the power of the grand jury to investigate criminal offenses." The motion to quash was denied. 377 F.Supp. at 286.

This Court concludes that *Morgan* points the way to the proper resolution of the present motion. Unlike Judge Frankel's decision in *Doe, supra*, there is no explicit statement that the grand jury investigation is intended, from its inception, to assist IRS in the development of a civil tax case. On the contrary, all the indications in the record are to the effect that the grand jury is concentrating solely upon an investigation of criminal offenses. I find, in the record

on this motion, a disavowal of grand jury assistance in civil investigations comparable to that disavowal which Judge Gurfein relied upon in *Morgan*.

Other circumstances in the case, which Ulster stresses, do no more than confirm this conclusion. Ulster argues vehemently that since the documents embraced by the grand jury subpoena have previously been made available to IRS agents, the latter's investigation cannot be said to have been "stymied" within the meaning of the Internal Revenue Manual's procedures for "open-ended" grand jury proceedings.[10] However, the fact that the IRS agent previously obtained these documents supports the inference that the grand jury desires them for its own independent investigation into possible criminal offenses rather than being used as a tool to assist the IRS in obtaining, for a civil investigation, material otherwise unavailable to it.

The case at bar bears no meaningful resemblance to *In re Stolar*, 397 F.Supp. 520 (S.D.N.Y.1975), upon which Ulster places primary reliance. In *Stolar*, a magistrate's warrant was issued for the arrest of a fugitive. One William Sheperd was believed by the FBI to have information concerning that individual's whereabouts. Sheperd, learning that the FBI was seeking to interview him, consulted Stolar, an attorney, for legal advice. Stolar offered to the FBI agent a meeting with Sheperd, but the agent regarded that arrangement as insufficient, since the FBI wished to ascertain Sheperd's telephone number and his home and employment addresses. That information not having been forthcoming, attorney Stolar was served with a grand jury subpoena seeking to elicit the information. Judge Pierce held for this court that these particular circumstances constituted an abuse of the grand jury process. He summarized the circumstances as follows:

> "In this case an attorney has been subpoenaed in order that he might be questioned regarding the whereabouts of his client so that, in turn, the client could

---

**10.** See n.7, *supra*.

then be interrogated as to the whereabouts of a person suspected of having violated federal law. The government apparently was not satisfied with the proposal made by the attorney that he would make his client available for questioning by the FBI. Instead, the government chose to compel the attorney's appearance before the grand jury to obtain the information it sought. Under these circumstances, the Court believes that this constitutes an abuse of the grand jury process." 397 F.Supp. at 522–523.

The court continued:

"There is a basis to conclude, as movant asserts, that Sheperd's telephone number and addresses are needed not for purposes of the grand jury investigation as such but merely so that this data can be turned over to the FBI for whatever purposes that agency chooses to use it. It has been claimed—without contradiction—that the FBI agent in this case informed the attorney that he needed the information in question 'as background information' for his 'investigative file.' It would appear then, that the grand jury subpoena is being used not in aid of its proper functions but rather as an adjunct or tool of an FBI investigation. In this Court's view, such a procedure is impermissible." *Id.* at 523.

*Stolar* is entirely inapposite to the case at bar. In *Stolar*, the FBI attempted by use of a grand jury subpoena to obtain from Sheperd's attorney investigatory material relating to Sheperd, not needed for the purpose of the grand jury investigation, but on the contrary desired by the FBI for purposes of its own. In the case at bar, as Ulster itself stresses, the documents subpoenaed by the grand jury have already been made available to the IRS; the circumstances compel the inference that, unlike the situation in *Stolar*, the grand jury requires this material for legitimate criminal investigations of its own. *Stolar* should be limited to its own rather particular facts, as Judge Pierce, its author, recognized in distinguishing and declining to apply *Stolar* in *Wood, supra*, at 430 F.Supp. 47–48.

Ulster is critical of the United States Attorney disclosing matters occurring before the grand jury to IRS special agent Cesare. However, such disclosure is clearly contemplated by amended Rule 6(e), F.R. Cr.P., effective October 1, 1977, which permits, in sub-section (2)(A):

"Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce Federal criminal law."

Agent Cesare falls within that category of personnel referred to in Rule 6(e)(2)(A)(ii). In view of the express wording of the amended rule, and the legislative history of the amendment,[11] the Court perceives no

---

11. The purpose of the amendment is stated in the Senate Report to P.L. 95–78, 95th Cong., 1st Sess. (1977), at 2 U.S.Code Cong. & Admin. News p. 530:

"Attorneys for the Government in the performance of their duties with a grand jury must possess the authority to utilize the services of other government employees. Federal crimes are 'investigated' by the FBI, the IRS, or by Treasury agents and not by government prosecutors or the citizens who sit on grand juries. Federal agents gather and present information relating to criminal behavior to prosecutors who analyze and evaluate it and present it to grand juries.

Often the prosecutors need the assistance of the agents in evaluating evidence. Also, if further investigation is required during or after grand jury proceedings, or even during the course of criminal trials, the Federal agents must do it. There is no reason for a barrier of secrecy to exist between the facets of the criminal justice system upon which we all depend to enforce the criminal laws.

"The parameters of the authority of an attorney for the government to disclose grand jury information in the course of performing his own duties is not defined by Rule 6. However, a commonsense interpretation prevails, permitting 'Representatives of other

basis for foreclosing agent Cesare from access to the grand jury material. It should also be noted that Rule 6(e)(2)(B) specifically requires that government personnel in Cesare's position "shall not utilize that grand jury material for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce Federal criminal law." Disobedience of that mandate will not be presumed.[12]

█ It may be that, at a subsequent time, the IRS may make an application to receive the grand jury material for use in civil tax liability proceedings. Such disclosure is expressly contemplated by Rule 6(e)(2)(C)(i); whether the Court will direct the release of grand jury material for such purposes turns on the circumstances of each case. See e. g., *United States v. Saks & Co.*, 426 F.Supp. 812 (S.D.N.Y.1976); *In Re Grand Jury Investigation*, 414 F.Supp. 74 (S.D.N.Y.1976); and *Capitol Indemnity Corp. v. First Minnesota Construction Co.*, 405 F.Supp. 929 (D.Mass.1975).

█ It is not necessary, in this case, to consider whether and in what circumstances the Government could bring a Rule 6(e)

motion for disclosure of grand jury material for use in civil proceedings. It is sufficient to dispose of the present motion to observe that, both on the agency and Department of Justice levels as revealed by the record, the intended purpose of the grand jury is to inquire into possible criminal offenses; nor is there any indication in the record that the grand jury has departed, or contemplates departing, from that historical role. In these circumstances, there is no basis upon which this Court may quash the grand jury subpoena, or abort its efforts.

I have considered Ulster's other contentions, factual and legal, and find them to be without merit.[13]

Ulster has asked that, in the event of a ruling adverse to the motion, the question be certified for interlocutory appeal under 28 U.S.C. § 1292(b). The question in my judgment does not fall within the requirements of that section, and I decline to make the certification.

## CONCLUSION

For the reasons stated, Ulster's motion to quash the grand jury subpoena and to terminate the proceedings before the grand

---

government agencies actively assisting United States attorneys in a grand jury investigation . . . access to grand jury material in the performance of their duties.' Yet projected against this current practice, and the weight of case law, is the anomalous language of Rule 6(e) itself, which, in its present state of uncertainty, is spawning some judicial decisions highly restrictive of the use of government experts that require the government to 'show the necessity (to the Court) for each particular person's aid rather than showing merely a general necessity for assistance, expert or otherwise' and that make Rule 6(e) orders subject to interlocutory appeal.

"In this state of uncertainty, the Committee believes it is timely to redraft subdivision (e) of Rule 6 to make it clear."

**12.** I have considered the decision of the Sixth Circuit in *General Motors Corp. v. United States*, No. 77–1599, decided April 5, 1978, U.S. T.C. ¶ 9413 (not officially reported), which barred an IRS agent who had conducted preliminary investigations of the taxpayer from being appointed as a special attorney for the United States, empowered to assist in conducting the proceeding before the grand jury. No

such role is apparently contemplated for agent Cesare in the case at bar. If it were, I would prefer the dissent of Judge Merritt in *General Motors*, approving the procedure. *General Motors* was reheard by the Sixth Circuit *en banc* on June 13, 1978, and decision is pending.

**13.** For example, Ulster contends that IRS departed from its own manual procedures in referring the case to the Department of Justice, since in view of Ulster's cooperation in making documents available the IRS inquiry could not be characterized as "stymied". But the IRS also wanted Ulster officers or employees to give statements concerning those records; and to every request for such assistance counsel for Ulster responded, in effect, "no" or "not now". The IRS could reasonably regard the inquiry as "stymied". In any event, no basis is perceived for blocking an independent grand jury inquiry, which may go forward even in the total absence of a recommendation by IRS to the Department of Justice. *Morgan, supra*, at 377 F.Supp. 286. *A fortiori* it may do so if, *arguendo*, the IRS in making such a recommendation departed from internal procedures not intended for a taxpayer's benefit.

jury is denied in all respects, and the stay is vacated.

It is So Ordered.